**RECEIVED**
September 01, 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _Michael Trujillo_
DEPUTY

Case 3:22-cv-00123-FM Document 23-3 Filed 09/01/22 Page 1 of 30

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**El PASO DIVISION**

| | |
|---|---|
| **BRANDON CALLIER,** § | |
| § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | |
| § | |
| **WIDE MERCHANT INVESTMENT, INC.,** a § | **Case No. EP-22-CV-00123-FM** |
| California Corporation, **DAVID BOEM JOON** § | |
| **KIM, SYNERGY FINANCIAL, LLC** and **JOHN** § | |
| **DOES 1-4** § | |
| § | |
| **Defendants.** § | |
| § | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

COMES NOW PLAINTIFF BRANDON CALLIER with his Second Amended

Complaint and will allege and show as follows:

**PARTIES**

1.      The Plaintiff is BRANDON CALLIER ("Callier"), a natural person, and was present in

Texas for all calls, in this case in El Paso County.

2.      Defendant WIDE MERCHANT INVESTMENT, INC. ("Wide Merchant" or "WMI") is

a corporation organized and existing under the laws of California and can be served via

registered agent David Kim at 3580 Wilshire Boulevard, Suite 160, Los Angeles, California

90010.

3.      Defendant DAVID BOEM JOON KIM ("Kim") is a natural person, resident of

California, and Chief Financial Officer of Wide Merchant Investment, Inc be served at 428 S

June Street, Los Angeles, California 90020.

1

4.     Defendant Synergy Financial LLC is an unknown company marketing and selling merchant cash advance (MCA) loans on behalf of Defendant Wide Merchant Investment, Inc. and Defendant Boem Joon Kim.  Synergy Financial LLC does not have an immediately identifiable limited liability company registration on file with any of the 50 states, the District of Columbia, or territories controlled by the United States.  Synergy Financial LLC operates a website https://www.synergyfinancialllc, with purported physical addresses of 100 William Street 7th Floor, New York, New York, 10038, 2563 Major McKenzie Drive, Maple, Ontario L6A2E8 Canada, and 52 Martin Pl, Sydney NSW 2000 Australia.

## JURISDICTION AND VENUE

5.     Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

6.     This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 305.053 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds little complexity to the case; and doesn't seek money damages, so it is unlikely to predominate over the TCPA claims.

7.     Personal Jurisdiction.  This Court has general personal jurisdiction over the defendant because they have repeatedly directed that calls be placed to Texas residents and derived revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff. Defendant WMI has chosen Texas as the state to litigate all of the disputes that arise out of their merchant cash advance ("MCA") lending activities.   Defendant WMI has filed at least 68 Complaints in Harris County, Texas, and has affirmatively chosen the state of Texas as the

vehicle for the enforcement of their garnishment activities. This Court has personal jurisdiction over Defendant Kim because Defendant Kim personally participated in the actions listed below, and Defendant Kim, chose Texas as the forum to litigate all matters with respect to WMI MCA activities.  Defendant Kim, by virtue of his personal participation in WMI solicitation activities and choice of Texas as the WMI litigation forum, knew full well his activities could cause him to be hailed into Texas Courts.

8.      Venue.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

9.      This Court has venue over the defendants because the calls at issue were sent by or on behalf of the above-named defendants to the Plaintiff, a Texas resident.  Defendants directly target Texas residents when marketing their products and take the affirmative action of mailing statements and loan documents to Texas residents at their Texas mailing addresses.

## THE TELEPHONE CONSUMER PROTECTION
## ACT OF 1991, 47 U.S.C. § 227

10.      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

11.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

12.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

13.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b) 47 U.S.C. § 227(b)(3).

14.     Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

15.     The TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[2]

16.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

[2] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

17.    The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

18.    The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.  In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

19.    *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

20.    The FCC confirmed this principle in 2013 when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

21.    Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

22.     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of 29  a corporation could avoid individual liability, the TCPA would lose much of its force.").

## The Texas Business and Commerce Code 305.053

23.     The Texas Business and Commerce code has an analogous portion that is related to the TCPA and was violated in this case.

24.     Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

## FACTUAL ALLEGATIONS

25.     Plaintiff has been on the National Do-Not-Call Registry since December 2007.

26.     Plaintiff has received nearly one hundred phone calls within a twelve-month period to his personal cell phone (915) 383-4604 from a company named Synergy Financial ("Synergy") calling on behalf of Defendant Wide Merchant soliciting business funding.

27.     With information and belief Synergy Financial is an offshore company based out of Australia.

28.     Synergy is out of the reach of the laws of the United States and operates as an unaccountable entity whose identity is actively hidden by WMI.

29.     Synergy is an Independent Sales Organization (ISO) that makes phone calls at the

direction of, and for the benefit of, WMI.

30.     Through information and belief Wide Merchant has entered into a contractual agreement with Synergy to make solicitation phone calls on behalf of Wide Merchant.  Synergy makes these phone calls on behalf of Wide Merchant for compensation as part of an agreed-upon incentive structure.

31.     Through information and belief Synergy is compensated on a per lead basis and is incentivized to ignore do not call requests and do not call lists.

32.     Wide Merchant instructed Defendant Synergy on what states to target for solicitation calls and what hours to make the phone calls.

33.     Wide Merchant provided Defendant Synergy with the minimum requirements to obtain a merchant cash advance through Wide Merchant.  These requirements include, but weren't limited to:  minimum monthly revenue, minimum credit score, length of time in business, availability of a checking account, existing bankruptcy, and the current status of any existing debt or merchant cash advances.

34.     Synergy commissioned a series of solicitation phone calls at the direction, instruction, and guidance of Wide Merchant to meet the criteria outlined in paragraph 31.

35.     On March 15, 2022, Plaintiff applied for a loan and submitted an application to Synergy for the sole purpose of identifying the United States-based company on whose behalf Synergy was placing the phone calls.

36.     On March 17, 2022, at 5:24 PM as a direct and approximate result of the phone calls Plaintiff received from Synergy, and the application Plaintiff submitted to Synergy, Plaintiff received a contract for $40,000 directly from WMI via an email from info@widemerchant.com. Exhibit A. Exhibit A1.

37.     On March 18, 2022, 9:33 AM Plaintiff received a phone call from a Synergy

representative and had the following phone conversation.

> Synergy rep: "Did you receive the contract yesterday?"
> Plaintiff: "Who is it coming from?  What am I looking for in my email?"
> Synergy rep: "It should be coming from Wide Merchant and it's a DocuSign contract."
> Plaintiff: "Wide Merchant?"
> Synergy rep: "Yes, **Wide Merchant**, one of our **subsidiary companies**.  They should be sending you the contract from DocuSign.  It was sent yesterday at night.  I mean yesterday late afternoon."
> Plaintiff: "I got a contract that came in at 5 AM this morning. I just looked in my email."
> Synergy rep: "And how much is it for?"
> Plaintiff: "I haven't opened it up.  I just looked on my phone.  I just searched Wide Merchant on my phone.  So I haven't opened it up."
> Synergy rep: "Yeah, yeah, so that should be the one if its Wide Merchant for $40,000, that should be the one.  We're waiting on you to sign it."

38.     Plaintiff has a recording of the telephone conversation in paragraph 35 made consistent

with Texas law.

39.     On March 18, 2022, as a direct and approximate result of the phone calls Plaintiff

received from Synergy, Plaintiff received a contract directly from WMI via an email from

info@widemerchant.com.  Exhibit B.

40.     On March 21, 2022, as a direct and approximate result of the phone calls Plaintiff

received from Synergy, Plaintiff received a contract directly from WMI via an email from

info@widemerchant.com.  Exhibit C.

41.     On March 21, 2022, Plaintiff responded to a follow-up text message received by a

representative from Synergy named Aaron Cruz that states as follows:

> Aaron: "Any updates on the signed contract? Should I void the contract?" 9:10 AM
> Plaintiff: "I am traveling" 2:57 PM
> Aaron: "Should I void the offer then?" 2:57 PM
> Plaintiff: "Yes. I'm tired of the constant calls. Please don't call again."  2:57 PM
> Aaron: "Why would you be tired?  You did not update me anything (sic) on the contract

that was released last week.  Very unprofessional behavior from you." 2:58 PM

> Plaintiff: "Didn't I just tell you not to contact me"?  3:00 PM
>
> Aaron: "What would you do?  Why did you waste our time?" 3:01 PM

42.     Aaron continued to text and call Plaintiff fourteen times within 30 minutes after Plaintiff explicitly advised Aaron to stop calling.

43.     On March 23, 2022, as a direct and approximate result of the phone calls Plaintiff received from Synergy, Plaintiff received a contract directly from WMI via an email from info@widemerchant.com.  Exhibit D.

44.     On March 29, 2022, as a direct and approximate result of the phone calls Plaintiff received from Synergy, Plaintiff received a contract directly from WMI via an email from info@widemerchant.com.  Exhibit E.

45.     Defendant WMI continued to solicit Plaintiff by sending Plaintiff contract offers on March 23, 2022, and March 29, 2022, after Plaintiff had informed their representative not to contact Plaintiff anymore and Plaintiff was not interested in their services.

46.     On March 21, 2022, Plaintiff received a phone call from Cruz informing Plaintiff he simply needed to do the "funding call."

47.     The funding call is a process whereby the lender, in this case, WMI, in coordination with Synergy directs the borrower to the WMI website to log into "DecisionLogic" in order to verify the borrower's banking information.

48.     As part of the "funding call" process, the ISO, in this case, Synergy, schedules a three-way call with the lender, in this case, WMI, and the borrower.  The borrower, while on the phone with the ISO (Synergy) and lender (WMI), verifies their bank account by logging into DecisionLogic directly from the WMI website.  It is at this point that WMI verifies the banking information and funds the loan.

49. WMI receives the borrower's username and password for their business bank account during the DecisionLogic process. WMI then logs into the bank account and verifies the bank account is not negative, has a balance at least five times the daily payment, and has not been recently funded with any other MCA loans.

50. WMI calls the borrower after the DecisionLogic process and goes over the terms of the contract with the borrower. Once this call is completed WMI funds the borrower by a wire into their bank account.

51. WMI works in direct coordination with Synergy for bank verification because the bank account is the means by which WMI drafts its payments from the borrower.

52. WMI directly participates in the funding process by sending the borrower the loan contract directly from WMI and further participates by controlling the funding process during the DecisionLogic bank verification process.

53. WMI exercises control over Synergy by mandating the requirement of bank verification, the timing of the bank verification, the manner of the bank verification, and the requirement that the bank verification is done on the WMI website, https://www.widemerchantgroup.com, via the DecisionLogic hyperlink on the WMI website. Exhibit F.

54. WMI provides the platform and software for Synergy to verify banking information. The verification of bank information is the final step in the loan process Synergy initiates by making solicitation phone calls at the direction of, and for the benefit of WMI.

55. WMI does not give Synergy or any of their ISOs the opportunity to do the bank verification independently of WMI. WMI mandates the bank verification be completed on the WMI website after Synergy refers the client to WMI.

56.     Synergy calls potential borrowers at the direction of WMI and solicits MCAs at the direction of WMI. Synergy collects information from the solicited consumer at the direction of WMI. Synergy then collects an application from the consumer and delivers that information directly to WMI for processing.

57.     After receiving the application from Synergy, WMI processes the application and emails the contract directly to the borrower.

58.     Synergy does not make phone calls on behalf of WMI or submit MCA applications to WMI for free. WMI pays Synergy a commission for each, and every application Synergy submits to WMI and WMI approves and funds.

59.     WMI pays Synergy pursuant to a written agreement between WMI and Synergy.

60.     The written agreement between Synergy and WMI requires Synergy to perform a "bank verification" in coordination with, and with the direct participation of WMI.

61.     WMI pays Synergy from bank accounts WMI owns and controls.

62.     WMI knows the exact identity of Synergy and the exact location of Synergy and does not reveal the true identity of Synergy.

63.     Through information and belief, Synergy is a related company to WMI, and there is a potentially a "subsidiary" relationship as indicated by the Synergy representative in Paragraph 37.

64.     There is a direct link between the phone calls received by Plaintiff from Synergy and the approved funding contract Plaintiff received from WMI via email on at least five different occasions.

65.     WMI directly participates in the calling campaign and coordinates with their Independent Sales Organizations.

66.     On April 8, 2022, Plaintiff filed his Original Complaint against WMI alleging TCPA violating phone calls from Synergy on behalf of WMI.

67.     WMI was served with the Complaint on April 28, 2022, and was on notice from that point forward that Plaintiff did not want solicitation phone calls from Synergy or Wide Merchant.

68.     On June 23, 2022, Plaintiff began to receive additional phone calls from Defendant Synergy.

69.     On June 23, 2022, at 9:00 AM Mountain time Plaintiff received another phone call from Synergy.  Plaintiff asked the Synergy representative if the loan solicitation was being made on behalf of Wide Merchant and whether the loan would be with Wide Merchant.  The representative confirmed he was calling on behalf of Wide Merchant to solicit a merchant cash advance through Wide Merchant.

70.     On June 23, 2022, at 9:53 AM Plaintiff sent an email to Aaron Cruz asking if the "loan would be through Wide Merchant."

71.     On June 23, 2022, at 9:56 AM, Aaron Cruz responded to Plaintiff's email with an email saying "Yes" the loan would be through Wide Merchant.  Exhibit G.

72.     Plaintiff received additional phone calls from Synergy on July 13, 2022, and July 19, 2022, soliciting Plaintiff for loans through WMI.

73.     On August 11, 2022, Plaintiff received a phone call from Dan Brown ("Brown") soliciting Plaintiff.  Brown followed up this phone call with an email to Plaintiff.  Exhibit L.

74.     On August 19, 2022, Plaintiff received an email from Aaron Cruz asking Plaintiff to send bank statements for loan processing.  Yet, again continuing the solicitation of Plaintiff that WMI refuses to put an end to.  Exhibit I.

75.     On August 21, 2022, Plaintiff emailed Wide Merchant's attorney a draft of a Proposed 2nd Amended Complaint.  This proposed 2nd Amended Complaint detailed additional phone calls Plaintiff was continuing to receive from Synergy.

76.     On August 23, 2022, Plaintiff received an email from Aaron Cruz, the Synergy agent and/or employee who solicits on behalf of Wide Merchant, soliciting Plaintiff for a loan through Wide Merchant.  Exhibit J.

77.     On August 31, 2022, Aaron Cruz called Plaintiff yet again soliciting Plaintiff for a loan through Wide Merchant.  Exhibit K.

78.     WMI was on full notice Plaintiff did not want phone calls from Synergy and actively turned a blind eye and allowed the phone calls to continue.

79.     WMI has been willfully negligent in its response to the phone calls Plaintiff has received from Synergy on behalf of WMI.  WMI has the contact information of both Synergy and Aaron Cruz and has taken no steps to stop the calls from coming to Plaintiff.

80.     WMI knows Plaintiff does not want these phone calls and has taken no steps to stop Synergy from soliciting on behalf of WMI.

81.     Synergy operates as a clandestine entity that does not have any trackable data on its website.  The Synergy phone number, address, website registration, and other information that could be used to identify a company is not registered to any publicly available source.

82.     A search of all 50 secretaries of state websites did not find any "Synergy Financial LLC" registered to do business in any state, the District of Columbia, or any United States Territory with an address, phone number, or website that matches the information found at https://www.synergyfinancellc.com.  Exhibit H.

83. Synergy operates as an unaccountable invisible operation with operations believed to be located offshore outside the reach of the laws and protections of the United States Government.

84. Defendant Wide Merchant is aware of Synergy's unlawful robocalling and their "do not call" violations and continues to accept applications from Synergy.

85. Defendant Wide Merchant is aware of and sanctioned Synergy's actions.

86. Synergy acts as an authorized agent of Defendant Wide Merchant.

87. There's essentially no difference between Synergy and Defendant Wide Merchant.

88. Defendant Kim controls and dominates Defendant Wide Merchant.

89. Defendant Kim is aware of the TCPA violations and personally participates in the calling campaign, and authorizes, the violations by ratifying the contract with the telemarketers, paying compensation to the telemarketers and refusing to take actions to stop the unlawful behavior because it benefits Defendant Kim financially.

90. Defendant Kim personally reviews and approves the contracts WMI offers as part of the Synergy telephone solicitation campaign.

91. Synergy on multiple occasions used a spoofed local area code in order to trick Plaintiff to thinking the calls were local and availed themselves of the resident forum.

92. Plaintiff received the following calls from Synergy (Table A).

| Number: | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1 | 10/26/2021 | 1:23 PM | 917-765-3437 | Call from Dan Brown |
| 2 | 10/27/2021 | 12:39 PM | 917-765-3437 | Call from Dan Brown |
| 3 | 01/06/2022 | 12:37 PM | 917-765-3437 | Call from Dan Brown |
| 4 | 02/03/2022 | 2:35 PM | 917-765-3437 | Call from Dan Brown |
| 5 | 02/03/2022 | 3:06 PM | 917-765-3437 | Call from Dan Brown |
| 6 | 02/03/2022 | 4:23 PM | 917-765-3437 | Call from Dan Brown |
| 7 | 02/04/2022 | 12:05 PM | 917-765-3437 | Call from Dan Brown |
| 8 | 02/18/2022 | 9:53 AM | 915-921-1529 | Missed Call |
| 9 | 02/18/2022 | 9:53 AM | 915-921-1529 | Telemarketer for Synergy |

14

| 10 | 02/18/2022 | 2:55 PM | 917-764-6878 | Direct call from Synergy |
|---|---|---|---|---|
| 11 | 02/22/2022 | 8:26 AM | 917-764-7079 | Direct call from Synergy |
| 12 | 02/22/2022 | 9:36 AM | 917-764-7079 | Direct call from Synergy |
| 13 | 02/22/2022 | 9:36 AM | 917-764-7079 | Direct call from Synergy |
| 14 | 02/22/2022 | 10:22 AM | 917-764-7079 | Direct call from Synergy |
| 15 | 02/22/2022 | 12:48 PM | 917-764-7079 | Direct call from Synergy |
| 16 | 02/22/2022 | 1:01 PM | 917-764-7079 | Direct call from Synergy |
| 17 | 02/22/2022 | 3:04 PM | 21093 | Automated Short Text |
| 18 | 02/22/2022 | 3:05 PM | 21093 | Automated Short Text |
| 19 | 02/24/2022 | 3:05 PM | 21093 | Automated Short Text |
| 20 | 03/03/2022 | 3:01 PM | 21093 | Automated Short Text |
| 21 | 03/07/2022 | 11:17 AM | 21093 | Automated Short Text |
| 22 | 03/07/2022 | 1:15 PM | 21093 | Automated Short Text |
| 23 | 03/16/2022 | 9:02 AM | 21093 | Automated Short Text |
| 24 | 03/16/2022 | 9:02 AM | 21093 | Automated Short Text |
| 25 | 03/17/2022 | 3:38 PM | 917-387-4655 | Call from Aaron Cruz |
| 26 | 03/18/2022 | 10:39 AM | 972-528-5166 | Call from Synergy Agent |
| 27 | 03/18/2022 | 2:28 PM | 917-387-4655 | Call from Aaron Cruz |
| 28 | 03/18/2022 | 2:41 PM | 21093 | Automated Short Text |
| 29 | 03/18/2022 | 3:34 PM | 917-387-4655 | Call from Aaron Cruz |
| 30 | 03/21/2022 | 2:58 PM | 917-387-4655 | Text Message from Aaron Cruz |
| 31 | 03/21/2022 | 2:58 PM | 917-387-4655 | Text Message from Aaron Cruz |
| 32 | 03/21/2022 | 3:00 PM | 917-387-4655 | Text Message from Aaron Cruz |
| 33 | 03/21/2022 | 3:01 PM | 917-387-4655 | Text Message from Aaron Cruz |
| 34 | 03/21/2022 | 3:01 PM | 917-387-4655 | Text Message from Aaron Cruz |
| 35 | 03/21/2022 | 3:02 PM | 917-387-4655 | Call from Aaron Cruz |
| 36 | 03/21/2022 | 3:02 PM | 917-387-4655 | Call from Aaron Cruz |
| 37 | 03/21/2022 | 3:03 PM | 917-387-4655 | Call from Aaron Cruz |
| 38 | 03/21/2022 | 3:03 PM | 917-387-4655 | Call from Aaron Cruz |
| 39 | 03/21/2022 | 3:04 PM | 917-387-4655 | Call from Aaron Cruz |
| 40 | 03/21/2022 | 3:04 PM | 917-387-4655 | Text Message from Aaron Cruz |
| 41 | 03/21/2022 | 3:05 PM | 917-387-4655 | Call from Aaron Cruz |
| 42 | 03/21/2022 | 3:05 PM | 917-387-4655 | Call from Aaron Cruz |
| 43 | 03/21/2022 | 3:28 PM | 917-387-4655 | Call from Aaron Cruz |
| 44 | 03/28/2022 | 10:08 AM | 917-261-3813 | Sent Email after phone call |
| 45 | 03/30/2022 | 12:41 PM | 917-387-4655 | Call from Aaron Cruz |
| 46 | 03/30/2022 | 3:30 PM | 917-261-3813 | Sent Email after phone call |
| 47 | 03/31/2022 | 12:06 PM | 915-285-2010 | Received call from Telemarketer transferred to Michael Gruber |
| 48 | 04/01/2022 | 8:43 AM | 915-302-7171 | Received call from Telemarketer transferred to Michael Gruber |
| 49 | 04/04/2022 | 11:15 AM | 915-302-7171 | Missed Call |
| 50 | 04/05/2022 | 11:35 AM | 915-302-7171 | Received call from Telemarketer transferred to Michael Gruber |

| 51 | 04/05/2022 | 2:00 PM | 917-261-3813 | Missed Call |
|----|-----------|---------|--------------|-------------|
| 52 | 04/07/2022 | 2:46 PM | 917-387-4655 | Missed Call |
| 53 | 06/23/2022 | 9:00 AM | 917-764-7740 | Aaron Cruz – Sent email |
| 54 | 06/23/2022 | 9:02 AM | 917-764-7740 | Aaron Cruz sent email confirm |
| 55 | 06/23/2022 | 10:47 AM | 917-387-4655 | Text from Aaron Cruz |
| 56 | 06/23/2022 | 10:47 AM | 917-387-4655 | Text from Aaron Cruz |
| 57 | 06/23/2022 | 11:00 AM | 972-528-5166 | Spoofed call from Aaron Cruz |
| 58 | 06/23/2022 | 2:31 PM | 972-528-5166 | Missed Call |
| 59 | 06/23/2022 | 2:32 PM | 917-624-9818 | Spoke to Aaron Cruz |
| 60 | 07/13/2022 | 2:14 PM | 917-810-5279 | Call from |
| 61 | 07/13/2022 | 3:06 PM | 917-387-4655 | Call from Aaron Cruz |
| 62 | 07/19/2022 | 11:15 AM | 917-590-3169 | Sent email from Dan Brown |
| 63 | 07/19/2022 | 11:32 AM | 917-590-3169 | Spoke to Dan Brown |
| 64 | 08/11/2022 | 4:41 PM | 915-774-6942 | Spoke to Dan Brown.  Sent email. |
| 65 | 08/30/2022 | 4:24 PM | 917-387-4655 | Call from Aaron Cruz |

93.     Defendants employ outrageous, aggressive, and illegal sales techniques that violate multiple federal laws and state consumer statutes.

94.     None of the Defendants registered pursuant to § 302.101 of the Texas Business & Commerce Code to provide telephone solicitations. The https://direct.sos.state.tx.us/telephone/telephonesearch.asp site ("Texas Registration Database") does not contain any of the Defendants' registrations.

95.     None of the Defendants qualify for an exemption under § 302.101.

96.     No emergency necessitated none of the alleged illegal robocalls.

97.     The Defendants never sent Mr. Callier any do-not-call policy.  Plaintiff sent an internal do-not-call policy request to info@synergyfinancellc.com and info@widemerchantgroup.com.

98.     On information and belief, the Defendants did not have a written do-not-call policy while they were sending Mr. Callier the unsolicited calls.

99.      On information and belief, the Defendants did not train its agents who engaged in telemarketing on the existence and use of any do-not-call list.

16

100.     Defendants participated in, facilitated, directed, authorized, knew of or willfully ignored

the false and misleading sales practices and unlawful robocalling, while knowing facts that

required a reasonable person to investigate further, and approved, and ratified the conduct of

their employees, agents, and co-conspirators to engage in the false and misleading sales practices

and unlawful robocalling.

101.     Mr. Callier has limited data storage capacity on his cellular telephone. Incoming

telemarketing calls consumed part of this capacity.

## VICARIOUS LIABILITY OF DEFENDANT WIDE MERCHANT

102.     Defendant Wide Merchant is vicariously liable under the theories of implied authority,

apparent authority, and ratification, and as well as liable because any other result would impair

the underlying purpose of the TCPA.

103.     "A[n] entity may be held vicariously liable for violations of the TCPA 'under a broad

range of agency principles, including not only formal agency, but also principles of apparent

authority and ratification.'" Aranda v. Caribbean Cruise Line, Inc., 179 F. Supp. 3d 817, 831

(N.D. Ill. 2016) (Quoting In re Joint Petition filed by Dish Network, LLC, 28 F.C.C. R. 6574,

6582 ¶ 28 (2013)).  "Formal Agency" in this context means actual authority, which may be

express or implied. Id.

104.     Defendants Wide Merchant and Kim gave express authority and apparent authority to

Synergy Financial with full knowledge the administration of sales and solicitation of sales would

be conducted via TCPA violating phone calls.

105.     Defendants Wide Merchant and Kim have ratified the conduct and behavior of Synergy

Financial by repeatedly signing contracts to hire them to administer sales and the solicitation of

sales of their business funding services with the full knowledge and expectation Defendants

17

would violate the TCPA.

106.    Defendant Wide Merchant has not terminated itationship with Synergy and continues to solicit Plaintiff through phone calls from Synergy.

107.    WMI continues to knowingly accept applications directly from Synergy despite being on alert for multiple months Synergy was violating the TCPA.

108.    Wide Merchant directly participates in the phone calls made by Synergy by sending the contracts to borrowers directly from WMI and then completing the DecisionLogic funding process with both Synergy and the borrower who was called by Synergy.

109.    Wide Merchant had actual knowledge of Synergy's TCPA violating practices and procedures and turned a blind eye to those violations.

110.    Wide Merchant knew Synergy was calling Plaintiff on their behalf and that Plaintiff did not want those phone calls.  WMI was on full notice Plaintiff did not want phone calls soliciting their MCA loans and did nothing to stop Synergy from calling Plaintiff.

111.    Synergy was still calling Plaintiff and soliciting Plaintiff for loans through WMI because WMI was continuing to accept applications from Synergy with the full knowledge Synergy was violating the TCPA.

112.    Wide Merchant failed to take even the most minimal action by having Synergy remove Plaintiff from their solicitation database.  WMI has contact information for Synergy, though they have actively kept that information from Plaintiff, and refused to instruct Synergy to stop violating the TCPA and to cease contact with Plaintiff.

113.    Failure to hold Wide Merchant and Kim responsible for the calls made on their behalf will be a signal to other TCPA violators they can escape TCPA liability by hiring offshore and/or invisible entities to make phone calls on their behalf.

114. Not only does the seller have the responsibility to ensure TCPA compliance for calls made on their behalf, but they also have the responsibility to ensure those companies operate in the sunlight and are not taking active measures to avoid detection.

115. There is evidence Wide Merchant was provided evidence of the TCPA violating phone calls being made by Synergy and Wide Merchant communicated consent to Synergy through acquiescence when Wide Merchant continued to accept applications from Synergy.

116. A reasonable jury could find Wide Merchant ratified Synergy's behavior by remaining silent and continuing to accept the benefits of Synergy's torturous conduct despite knowing what Synergy was doing, or at the very least, knowing of facts that would have led a reasonable person to investigate further.

117. Defendant Wide Merchant continues to ratify the behavior of Synergy by failing to repudiate the actions of Synergy. Synergy called Plaintiff as recently as August 30, 2022, more than three months after Wide Merchant was alerted of the unwanted phone calls.

118. Wide Merchant has been willfully negligent in its response to the unwanted phone calls made to Plaintiff and continues to allow Synergy to solicit on behalf of Wide Merchant and to submit applications to Wide Merchant.

119. Wide Merchant is aware of the actions of Synergy and has shut its eyes to Synergy's behavior and directed calls towards Plaintiff.

120. Wide Merchant made an outward manifestation of apparent authority to Synergy when Wide Merchant continued to accept credit applications from Synergy despite knowing full well Synergy was making TCPA-violating phone calls.

121. Wide Merchant has not asked Synergy to scrub the national do not call list. Wide Merchant has not asked Synergy to stop calling Plaintiff. Wide Merchant has not taken any

reasonable steps to bring Synergy into TCPA compliance.

## DEFENDANT KIM IS PERSONALLY LIABLE

122.    Defendant Kim refuses to take any action to stop or curtail the unlawful sales practices

and robocalling because these practices benefit Defendant Kim financially.

"If the officer directly participated in or authorized the statutory violation, even

though acting on behalf of the corporation, he may be personally liable.  See *United*

*States v Pollution Serv. Of Oswego, Inc*., 763 F.2d 133, 134-135 (2nd Cir.1985)

The "well-settled" tort rule provides that "when corporate officers directly

participate in or authorized the commission of a wrongful act, even if the act is done

on behalf of the corporation, they may be personally liable."  *General Motos*

*Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992).  The Fifth Circuit

has elaborated that "the thrust of the general [tort] rule is that the officer to be held

personally liable must have some direct, personal participation in the tort, as where

the defendant was the 'guiding spirit' behind the wrongful conduct….or the 'central

figure' in the challenged corporate activity."  *Mozingo v. Correct Mfg. Corp*., 752

F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp*.,

619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc*., 164 F.

Supp. 2d 892 (W.D. Tex. 2001)

Quoting Texas v. American Blastfax:

The Court finds the above principles applicable to the TCPA that is, an officer may be
personally liable under the TCPA if he had direct, personal participation in or
personally authorized the conduct found to have violated the statute, and was not
merely tangentially involved.  Individuals who directly (and here, knowingly and
willfully) violate the TCPA should not escape liability solely because they are
corporate officers.  As the State persuasive argues, to hold otherwise would allow the
individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and
repeat their conduct.  Congress surely did not intend to permit such a result in passing
the TCPA.

To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" an the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful contuct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is fare more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001)

123.    The Same Court held that corporate officers were also personally liable for DTPA violations

The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct…..For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., *Barclay v. Johnson*, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation……Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc*., 164 F. Supp. 2d 892 (W.D. Tex. 2001

124.    At all times material to the Complaint, acting alone or in concert with others, Defendant

Kim has formulated, directed, controlled, had the authority to control, or participated in the acts

and practices of Defendant Wide Merchant including the acts or practices set forth in this

Complaint.

125.    Defendant Kim, the principal director and operator of Defendant Wide Merchant,

controls the day-to-day operations of Wide Merchant and directed their employees, agents,

salespersons, and solicitors to make TCPA violating phone calls and solicit their business funding services.

126.    Defendant Kim approved the telemarketing scripts, signed the contracts, paid commissions for the illegal behavior, and directed the illegal calls to be made for his financial benefit.

127.    Defendant Kim is not merely a bystander.  He is the mastermind that schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

128.    Defendant Kim directly participates in the calling campaign by being involved in the approval process.

129.    The DocuSign contracts sent to Plaintiff by Defendant WMI show the direct participation of Defendant Kim.   Exhibit I.

130.    Defendant Kim is directly involved in the process and views and approves of the contracts submitted to WMI by Defendant Synergy.

131.    Defendant Kim reviewed and approved the contract sent by WMI to Plaintiff as a direct result of the phone calls made to Plaintiff on WMI's behalf by Synergy.

132.    Defendant Kim is well aware his conduct violated the TCPA and Tex. DPTA and refused to alter their behavior.  Defendant Kim is the sole director of Wide Merchant and the only person with the power to make the unlawful, fraudulent, and unethical behavior stop.  Yet, Kim has taken no steps to stop the behavior because the behavior benefits Kim financially.  Defendant Kim breaks the law with his eyes and pocketbooks wide open.

133.    Defendants Wide Merchant and Kim should be held jointly and severally liable for both the TCPA violations and Tex. Bus. Com. Code 302.101 via Tex. DTPA because they actually

committed the conduct that violated the TCPA and Tex. DTPA, and/or they actively oversaw and directed this conduct.

134.    Defendant Kim should be held liable because to do otherwise would simply allow him to dissolve Wide Merchant and set up a new corporation and repeat their conduct.  This would result in both the TCPA and DTPA being unenforceable.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE DETERRENT EFFECT AND PURPOSE OF THE TCPA

135.    As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA

136.    Every entity in the application for "business funding" should be deemed a beneficiary of the calls and held liable for damages under the TCPA under vicarious liability. Sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA and to hold otherwise would leave consumers without an effective remedy for telemarketing intrusions.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

137.    Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

138.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

139.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

140.    Defendants' calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

141.    Plaintiff has been harmed, injured, and damaged by the calls including but not limited to: reduced device storage, reduced data plan usage, invasion of privacy, reduced enjoyment and usage of his cell phone, reduced battery usage, anger, and frustration.

### Plaintiff's cell phone is a residential number

142.    The calls were to Plaintiff's cellular phone 915-383-XXXX, which is Plaintiff's personal cell phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 10 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

### Violations of the Texas Business and Commerce Code 305.053

143.    The actions of the Defendants violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violates 47 USC 227(b). The calls by the defendants violated Texas law by placing calls with a pre-recorded message to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

144.    The calls by the Defendants violated Texas law by spoofing the caller ID's per 47 USC 227(e) which in turn violates the Texas statute.

### Violations of the Texas Business and Commerce Code § 302.101

145.    The actions of the defendants violated the Texas Business and Commerce Code 302.101

by placing solicitation phone calls to a Texas resident without having registration certificate and bond on file with the Texas Secretary of State.

146. Texas Business and Commerce Code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

147. The use or employment by any person of a false, misleading, or deceptive act or practice" causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50.

148. Texas Business and Commerce Code §302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

149. Under Texas Business and Commerce Code § 302.302 Plaintiff is entitled to seek damages of up to $5000 per violation of §302.101.

**FIRST CAUSE OF ACTION**

**Willful and/or Knowing Violation of 47 U.S.C. § 227**
**Telephone Consumer Protection Act of 1991**
**(Against all Defendants)**

150. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

151. Defendants and/or their agents placed calls to Plaintiff's cellular telephone.

152. Plaintiff never consented to receive calls from Defendants. Plaintiff has no relationship with Defendants.

153.     Defendants' calls were made for purposes of advertising and marketing Defendant Wide Merchant business funding services.  These calls constituted commercial advertising and telemarketing as contemplated by the TCPA.

154.     The calls were made using an ATDS to the cellular phone of Plaintiff in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and (B).

155.     As a result of their unlawful conduct, Defendants repeatedly invaded the personal privacy of Plaintiffs, causing Plaintiff to suffer damages and, under 47 U.S.C. § 227(b)(3)(B), entitling Plaintiff to recover $500 in statutory damages for each violation and an injunction requiring Defendants to stop their unlawful calling campaigns.

156.     Not only did Defendants make these violating calls, Defendants and/or their agents did so "knowingly" and/or "willfully' under 47 U.S.C. § 227 (b)(3)(C).

157.     If the Court finds that Defendants willfully or knowingly violated this subsection, the Court may exercise its discretion to increase the amount of the award from $500 to $1500 per violation under 47 U.S.C. § 227(b)(3)(C).

## SECOND CAUSE OF ACTION

**(Violation of the TCPA "Sales Call/DNC" Prohibition, 47 C.F.R. § 64.1200(C))**

**(Against All Defendants)**

158.     Plaintiff incorporates the forgoing allegations as if fully set forth herein.

159.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute a violation of FCC regulations by making multiple telemarketing solicitations to a consumer on the National Do-Not-Call Registry within a 12-month period in violation of 47 C.F.R. § 64.1200(c)(2).

160.    Defendants called Plaintiff's private residential telephone number which was successfully

registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls,

in violation of 47 U.S.C § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

161.    Plaintiff was statutorily damaged at least fifty-two (52) times under 47 U.S.C. §

227(c)(3)(F) by the Defendants by the telephone calls described above, in the amount of $500

per call.

162.    Plaintiff is entitled to an award of at least $500 in damages for each such violation.  47

U.S.C. § 227(c)(5)(B).

163.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful

violation of 47 U.S.C. § 227(c)(3)(F).

**THIRD CAUSE OF ACTION**

**Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)**

**(Against All Defendants)**

164.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

165.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute

multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

      a.   written policy, available upon demand, for maintaining a do-not-call list, in

            violation of 47 C.F.R. § 64.1200(d)(1) [3];

      b.   training for the individuals involved in the telemarketing on the existence of and

            use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2) [4]; and,

---

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 (codifying a June 26, 2003 FCC order).

     c.  in the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[5]

166.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

167.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## FOURTH CAUSE OF ACTION
### Violations of The Texas Business and Commerce Code 305.053
### (Against All Defendants)

168.    Plaintiff incorporates the foregoing allegations as if set forth herein.

169.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by making non-emergency telemarketing robocalls to Mr. Callier cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. The Defendants violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

170.    Plaintiff is entitled to an award of at least $500 in damages for each such violation.

**Texas Business and Commerce Code 305.053(b)**

171.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c)

---

[5] *See id.* at 425 (codifying a June 26, 2003 FCC order

**FIFTH CAUSE OF ACTION**

**(Violations of The Texas Business and Commerce Code 302.101)**

**(Against All Defendants)**

172.     Plaintiff incorporates the foregoing allegations as if set forth herein. by reference each and every allegation set forth in the preceding paragraphs.

173.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 302.101**, by making non-registered solicitation calls to Plaintiff's cellular telephone number without his prior express written consent.

174.    Plaintiff is entitled to an award of up to $5,000 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 302.302(a)**.

175.    Plaintiff is entitled to recover all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees.  **Texas Business and Commerce Code 302.302(d)**

**I. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the defendants jointly and severally as follows:

A.      Leave to amend this Complaint to name additional DOESs as they are identified and to confirm to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.      An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

29

D.      An award of $3000 per call in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for 63 calls.

E.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101.

G.      An award to Mr. Callier of damages, as allowed by law under the TCPA;

H.      An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

I.      Such further relief as the Court deems necessary, just, and proper.

Dated September 1, 2022,                    Respectfully Submitted,

*Brandon Callier*

Brandon Callier
Plaintiff, Pro Se
6336 Franklin Trail Drive
El Paso, TX 79912
915-383-4604