UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| BRANDON CALLIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:22-cv-00123-FM |
| | ) | |
| WIDE MERCHANT INVESTMENT, INC. | ) | |
| a California corporation, and DAVID | ) | |
| BOEM JOON KIM, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF DAVID BOEM JOON KIM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR IN THE ALTERNATIVE, FAILURE TO STATE A CLAIM

I, David Boem Joon Kim, declare:

1.     I am the Chief Executive Officer of Defendant Wide Merchant Investment Inc. I have also been named as an individual defendant in this action. I have personal knowledge of the matters set forth in my declaration, and if called upon to do so could and would competently testify as to those matters.

2.     I am a resident of the County of Los Angeles, State of California. I do not live in the State of Texas, nor do I own or lease any property in the State of Texas.

3.     WMI is a private merchant advance company that offers small businesses operating capital by purchasing their invoices for an upfront cash advance and receiving a portion of future sales in return. WMI is a California Corporation, with its office and principal place of business in the County of Los Angeles, State of California.

1

4. While WMI offers merchant advances to small businesses throughout the United States, including businesses in the State of Texas, WMI does not have any offices or employees in the State of Texas.

5. WMI's merchant advance customers are typically repeat customers that have used WMI's merchant case advance services in the past. Additionally, WMI does obtain referrals from independent sales organizations ("ISOs") that work with merchants seeking the type of merchant advance services that are offered from companies such as WMI. Those ISOs are independent brokers who will provide referrals to merchants seeking merchant advance services and other business financial products that may be offered by merchant advance companies, like WMI, and/or other companies that provide unrelated lending products, which WMI does not provide. Neither WMI, nor any of its affiliated or subsidiary entities, have ever contracted with any third party to make outbound sales calls on WMI's behalf.

6. Blue Coast Service, Inc. ("BCS") is a Nevada corporation, qualified to do business in California, that is affiliated with WMI. I am also the Chief Executive Officer of BCS.

7. On or about August 18, 2020, BCS entered into an Independent Agent Marketing and Referral Agreement with Synergy BPO, LLC ("Synergy") (the "Independent Agent Agreement"). The relevant portion of the Independent Agent Agreement is attached hereto as Exhibit A (proprietary and confidential terms regarding commission payments have been redacted). Outside of the Independent Agent Agreement, there is no relationship between Synergy and BCS, including any sort of corporate affiliation. Likewise, there is no relationship between Synergy and WMI, including any sort of corporate affiliation.

8.      Pursuant to the Independent Agent Agreement, Synergy was authorized to promote certain merchant advance products provided by BCS, and refer merchant applications to BCS. The Independent Agent Agreement specifies that Synergy "is an independent contractor whose powers are restricted and limited by this Agreement." Under the Independent Agent Agreement, Synergy was obligated to "accurately describe BCS's product to prospective merchants." Synergy was also expressly prohibited from representing to any persons that "he/she is an employee of BCS." The Independent Agent Agreement provides that BCS determines the terms of any merchant advance in its sole discretion, including "[t]he purchasing price, amount purchased, discounted rate()s, and fee(s)."

9.      The Independent Agent Agreement further provides the Synergy does not "have any power to bind BCS to any legal obligation(s)," and expressly prohibited Synergy from "creat[ing] or provid[ing] any written or electronic material that ha[ve] BCS's logo, trademark, or trade name to any person(s), without prior-written consent from BCS to do so." Moreover, the Independent Agent Agreement provides that any expenses incurred by Agent in marketing BCS's product are Synergy's sole responsibility.

10.      Neither WMI nor BCS exercise any control, whatsoever, over the means and methods by which Synergy carries out its duties under the Independent Agent Agreement. WMI and BCS do not in any way control, and have no involvement whatsoever, in the details of the process by which Synergy conducts its business, including with respect to any telemarketing activity conducted by Synergy. WMI and BCS have no role or involvement in Synergy's selection of who to market to, or the manner in which they conduct their marketing operations. Any marketing operations of Synergy, including how they obtain leads, who they call, and what

they say during these calls, are determined and conducted independently by Synergy, without any involvement, input, or control by WMI or BCS.

11.    On or about March 15, 2022, Synergy referred to BCS an application from a business called "Gonna Keep on Trucking LLC" that was signed by Brandon Callier. A copy of this application is attached hereto as Exhibit B. Neither WMI nor BCS had any involvement in Synergy's efforts to obtain this application. In addition, WMI and BCS did not prepare Synergy's form application, and did not have any input or control over the creation of Synergy's form application.

12.    BCS in turn referred this application to WMI for consideration. WMI reviewed the application, and approved Gonna Keep on Trucking LLC for a merchant advance product. Based upon this approval, WMI transmitted a Purchase and Sale of Future Receivables Agreement ("Receivables Agreement") to callier74@gmail.com, which was the e-mail address for Gonna Keep on Trucking LLC provided on the application. A copy of the Receivables Agreement is attached hereto as Exhibit C. WMI sent the Receivables Agreement to the callier74@gmail.com e-mail address via an automated Docusign transmission. The Receivables Agreement was never executed.

13.    Nobody at either WMI or BCS had any direct communications with Plaintiff at any point in time.

14.    Neither WMI nor BCS ever called Plaintiff, or ever spoke with Plaintiff over the phone. Likewise, WMI and BCS never exchanged any communications with Plaintiff through any other mode of communication, such as e-mail or text message.

15. Until the date this lawsuit was filed, neither WMI nor BCS had any knowledge of any telephone calls made by Synergy.

16. Neither WMI nor BCS had any involvement in any telephone calls made by Synergy to Plaintiff, or any other individual. WMI and BCS did not control, approve, or otherwise have knowledge of any telephone calls made by Synergy to any individual, including Plaintiff.

17. WMI and BCS do not make any outbound sales calls to any consumers, including any consumers in the State of Texas.

18. WMI and BCS have never called Plaintiff Brandon Callier at the (915) 383-4604 telephone number at which Mr. Callier alleges he received calls in his Complaint, or any other telephone number.

19. I have never personally called Plaintiff Brandon Callier at the (915) 383-4604 telephone number at which Mr. Callier alleges he received calls in his Complaint, or any other telephone number. Moreover, I have never directed anyone to call Mr. Callier.

20. WMI and BCS have not at any time hired any third party to make any outbound sales calls on WMI's behalf. As set forth above, WMI does not have any contractual relationship with Synergy Financial and certainly does not have any contract whereby Synergy Financial would have been authorized to make outbound sales calls on WMI's behalf.

21. WMI and BCS have never authorized anyone at Synergy Financial, or any other third party, to make any outbound sales calls to any individuals, including Mr. Callier. I have never directed or personally participated in any outbound sales calls to any individuals, including Mr. Callier.

5

22.     At no point has anyone at WMI or BCS, including myself, authorized, asked, or engaged Synergy Financial to make any telephone calls for any purpose, including telephone calls on behalf of WMI.

23.     At no point has anyone at WMI or BCS, including myself, instructed Synergy on when and which states to solicit via telephone calls or the minimum requirements to obtain a merchant advance through WMI. At no point has any one at WMI or BCS provided Synergy with any marketing guidelines, scripts, or similar documents.

24.     At no point has anyone at WMI or BCS, including myself, had any direct communications with Aaron Cruz of Synergy Financial.

25.     At no point has anyone at WMI or BCS, including myself, had any direct communications with Plaintiff Brandon Callier.

26.     Prior to this lawsuit, nobody at WMI or BCS had any knowledge of any sort of calls made by Synergy Financial, including any calls purportedly made by Synergy on behalf of WMI. Prior to this lawsuit, WMI had never received any complaints or other information relating to telemarketing calls purportedly made by any third party, including Synergy Financial, on WMI's behalf.

27.     Prior to this lawsuit, I personally had no knowledge of any sort of calls made by Synergy Financial, and certainly never heard of any allegations that Synergy Financial was making calls on behalf of BCS or WMI, which would not have been authorized by either entity.

28.     Although WMI and BCS have no control over Synergy, including its marketing operations, WMI advised Synergy of this lawsuit and requested that it honor Plaintiff's request to no longer receive calls. Subsequently, WMI learned that Plaintiff had made new allegations in

6

this lawsuit that he continued to receive calls from Synergy even after filing suit. As a result, BCS terminated the Independent Agent Agreement with Synergy effective September 28, 2022.

I declare under penalty of perjury under the laws of the State of California and under the laws of the United States that the foregoing is true and correct.

Executed in Los Angeles, California, on November _30_, 2022.

DAVID BOEM JOON KIM

# BLUE COAST SERVICE INC

3651 Lindell Rd Las Vegas, NV 89103

**Independent Agent Marketing and Referral Agreement**

This Independent Agent Marketing and Referral Agreement (the *Agreement*) dated effective as of _____ August 18, 2020 | 1:51 PM PDT (*Effective Date*) is entered into by and between Blue Coast Service Inc (*BCS*) and _____ Synergy BPO LLC _____ (*Agent*).

## RECITALS

BCS is a purchasing company engaged in the business of purchasing future receivables from merchants at a discounted price. The discounted purchase price is sometimes referred to as a *cash advance*. As BCS's independent marketing and referral agent, the *Agent* aspires to promote BCS's product to qualified merchants, and *BCS'* penchant to appoint *said Agent* as its authorized Agent to promote its product and refer merchants. Said Agent shall therefore be entitled to earn commission from BCS, on the prospective merchant's future receivables that BCS purchases in accordance with the terms of this Agreement.

**Thence**, in consideration of the mutual concordat and agreements enclosed within this Agreement, it is hereby agreed upon as follows:

I.    TERMS AND CONDITIONS

    a.   This Agreement will continue in force and effect, until the first anniversary date of the Effective Date. Without any material breach or a notice to terminate, this Agreement shall be automatically renewed annually as long as the minimum number of four (4) referrals by which entitle Agent to earn commissions are made by both Agent to BCS during each fiscal year (contract year); this is the *Minimum Commitment*.

    b.   This Agreement may be terminated by either party hereto at any time, insomuch that the other party is provided a 30-day written notice without cause. Notwithstanding, if Agent breaches any aforementioned terms of this Agreement, BCS may immediately terminate this Agreement. BCS will pay commission on the merchant's referred by said Agent, prior to the date of termination.

    c.   All of the representations, warranties, indemnities, and covenants made by said Agent herein shall survive the termination of this Agreement.

1

   d. BCS shall have the absolute sole discretion to review merchant's application, approve and execute a Merchant Receivable Sale Agreement (*MRSA*) to purchase the receivables from a merchant referred to by Agent.

II.   COMMISION



DocuSign Envelope ID: CA431644-C28B-481A-8864-0797540354EE

III.  AGENT DUTIES

   a.  Agent shall have the duty to accurately describe BCS's product to prospective merchants. BCS does not administer loans. Alternately, BCS's product is a purchasing, of which is similar to a factoring company. The purchasing price, amount purchased, the discounted rates, and fees are calculated based on the receivables projected to be generated by the merchant in the foreseeable and ascertainable future and its survivability. No traditional *interests* accumulate on the purchased receivables, but the merchant has absolute obligation to deliver the promised receivables to BCS as agreed upon by binding contract, enacted prior to the advancement of funds from BCS to merchant.

   b.  Agent is an independent contractor whose powers are restricted and limited by this Agreement. Agent shall therefore never represent nor avouch to any person(s) that he/she is an employee of BCS; ergo, shall not have any power to bind BCS to any legal obligation(s). The purchasing price, amount purchased, discounted rate(s), and fee(s) are determined under sole discretion by BCS, accordingly BCS will hold no obligations based on Agent's misrepresentation(s) or *sales talk*.

   c.  Agent shall be obliged not to create or provide any written or electronic material that has BCS's logo, trademark, or trade name to any person(s), without prior-written consent from BCS to do so. BCS's logo, trademark, and trade name are owned exclusively by BCS.

   d.  Any expenses incurred by Agent in marketing BCS's product, are the Agent's sole responsibility, and shall not be reimbursed by BCS.

   e.  Agent shall not request BCS to charge any of its independently fees or commissions to merchant and provide such fees or commissions to it, even if merchant agrees. Agent may collect said fees or commissions directly from the merchant.

   f.  Agent shall **NOT** refer the same merchant simultaneously to BCS and other companies that provide similar services. Such practice limits BCS's ability to accurately determine the merchant's receivables available to be purchased, and multiple sales of the same receivables could be made by the merchant. Such practice will be viewed as an **INTENTIONAL MISREPRESENTATION** by Agent.

   g.  <u>Confidential Third-Party Information</u>. Agent recognizes that both Agent and BCS, will in the future, receive from third-parties their private, sensitive, confidential, and/or proprietary information, of which will be subject to a duty on Agent and BCS's part to maintain this confidentiality of such information and thusly use it only for certain and limited purposes. Agent therein agrees to hold all such confidential and/or proprietary information in the strictest confidence and therefore not to disclose such information to any person(s), firm(s), and/or corporate entities; and to use it except as necessary in carrying out its work for BCS, consistent to and in accordance with BCS's agreement with said third-party or –parties.

IV.  MISCELLANEOUS TERMS AND CONDITIONS

   a.  <u>Indemnification.</u> All parties shall indemnify, defend, and hold harmless one another, from and against (i) all claims and causes of action(s) of any kind, including contract—tort or

otherwise—by and from third-party (or –parties) related to and/or arising out of this agreement and (ii) any losses, liabilities, and expenses—including, but not withstanding nor limited to—reasonable attorneys' fees and expenses incurred by either party, as a result of any such claims and/or causes of action(s).

b.  This Agreement shall be governed by, construed in accordance with the laws of, and abide by all implemented regulations of the State of California. The Parties hereto agree that all action(s) or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in the Central District of the Los Angeles County Superior Court and/or in the Western Division of the United States District Court in the Central District of the State of California. The aforementioned choice of venue is intended by the parties to be obligatory and mandatory, and therefore not permissive in nature; thereby precluding the possibility of litigation between the parties with respect to and/or arising out of this Agreement in any jurisdiction other than those specified in this paragraph.

c.  This Agreement constitutes the entire agreement between the parties in connection with the transactions contemplated hereunder and supersedes all previous agreements and understandings between the parties with respect to such subject matter, and cannot be changed or amended except by a formal agreement in writing signed by the other party.

d.  If any provision(s) of this Agreement is held to be invalid or unenforceable, then such provision shall (insofar it is invalid or unenforceable) be given no effect and shall therefore be deemed not to be included in this Agreement, but without invalidating any of the remaining provisions of this Agreement.

e.  The captions and the title of this Agreement are used solely for convenient reference and neither constitutes a part of this Agreement nor affects its meaning, interpretation, and/or effect.

f.  The parties involved may sign this Agreement in counterparts. Each signed counterpart shall be an original, and all of them together, constitute one and the same Agreement.

g.  The parties of this Agreement shall not, without the consent of the other, be entitled to assign the benefit or burden of this Agreement in whole or in part.

h.  The parties of this Agreement irrevocably waive trial by jury in an action, proceeding or counterclaim, whether at law or in equity, brought by either of them.

i.  If a claim by either party is asserted in any judicial or arbitration proceeding or appeal thereof, the party prevailing in such proceeding(s) shall be entitled to reimbursement of its costs and expenses, including, but not limited to: reasonable accounting, legal, attorneys', attorney assistants' and arbitration fees.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date set forth on page 1 of this Agreement.

Blue Coast Service Inc.                                    Agent

_____

By: Andy Abascal                                          By:   Mirza Jewel

Title: ISO Manager                                        Title:   Managing Member



# Synergy Financial Loan Application

➡ **Account Manager: Aaron Cruz, Direct Phone: 917-387-4655, Email:** aaron@synergyfinancellc.com, **Fax# 888-303-0299**

➡ If you are the sole owner applying for credit on behalf of your business and are relying on your own income or assets as a guarantor and not the income or assets of another person, complete Owner Information (1) and omit Owner Information (2).

➡ If this is an application for joint owners applying for credit on behalf of your business, complete Owner Information (1) and (2).

## COMPANY INFORMATION

| | | |
|---|---|---|
| Legal Company Name: **Gonna Keep on Trucking LLC** | Legal Entity: | Do you have an outstanding merchant cash advance? |
| Doing Business As (DBA): **NA** | ☐ Corporation    ☒ LLC | ☐ Yes, it is: $_____ |
| Tax ID: **81-2555653** | ☐ General Partnership    ☐ LLP | |
| | ☐ Sole Proprietorship | ☐ No |
| Physical Address (No P.O. Box): **12200 Folklore Ct** | Company Type / Industry: | |
| | State of Incorporation: | |
| City: **El Paso**   State: **TX**   Zip Code: **79936** | ☐ Own    ☐ Rent | |
| Company Phone: **915-929-8309** | Landlord Name: | |
| Business Inception Date: **4/29/2016** | Landlord Phone: | |

## REQUIRED FOR RECOMMENDED LOAN AMOUNT

| Gross Annual Business Revenue : | Average Bank Balance: | Monthly Credit Card Volume: | Loan Amount Requested: | Desired Loan Term: |
|---|---|---|---|---|
| $ | $ | $ | $ **50,000.00** | Months: |

## OWNER INFORMATION      OWNER INFORMATION

| | | | |
|---|---|---|---|
| First Name: **Brandon** | MI: | First Name: | MI: |
| Last Name: **Callier** | | Last Name: | |
| Email: **callier74@gmail.com** | | Email: | |
| Home Phone: | | Home Phone: | |
| Cell Phone: | | Cell Phone: | |
| Social Security Number: ▉ | | Social Security Number: | |
| Date of Birth: ▉ | | Date of Birth: | |
| Home Address (No P.O. Box): ▉ | | Home Address (No P.O. Box): | |
| City: **El Paso**   State: **TX** | | City:   State: | |
| Zip Code: **79912**   % Ownership: **100** | | Zip Code:   %Ownership: | |

The Merchant and Owner(s)/Offcer(s) dentified above (indiv dually, an "Appl cant") each represents, acknowledges and agrees that (1) all informat on and documents prov ded to Representative including cred t card processor statements are true, accurate and complete, (2) Appl cant will immediately notify Representative of any change in such information or financial condit on, (3) Appl cant authorizes Representative to disclose all information and documents that Representative may obtain including credit reports to other persons or entities (collectively, "Assignees") that may be involved with or acquire commercial loans having daily repayment features or purchases of future receivables including Merchant Cash Advance transact ons, including w thout lim tat on the appl cat on therefor (collectively, "Transactions"), and each Assignee is authorized to use such informat on and documents, and share such informat on and documents with other Assignees, in connection with potential Transact ons, (4) Representative and each Assignee will rely upon the accuracy and completeness of such information and documents, (5) Representative, Assignees, and each of their representatives, successors, assigns and designees (collectively, "Recipients") are authorized to request and receive any investigative reports, cred t reports, statements from cred tors or financial instit ons, verification of informat on, or any other informat on that a Recipient deems necessary, (6) Appl cant waives and releases any claims against Recipients and any informat on prov ders arising from any act or omiss on relating to the requesting, receiving or release of information, and (7) each Owner/Officer represents that he or she is authorized to sign this form on behalf of Merchant. A copy of this authorizat on may be accepted as an original. The term "Representative" shall mean any funding source looking to offer, make available, or prov de to the Merchant access to loans or merchant cash advances based on such Merchant's future receivables or sales and/or structured with a period c repayment feature.

Signature (1) _[DocuSigned signature]_ F977C895CA274C2...

Signature (2) _____

Date: **3/15/2022**



Adv No : L8592646

<span style="color:red">Exhibit C</span>

TEL 800.630.4214 FAX 866.221.4316
info@widemerchantinvestment.com

# PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This Purchase and Sale of Future Receivables Agreement ("Agreement") is made and effective this _____**17**_____ day of _____**March, 2022**_____ (the "effective date"), by and between **Gonna Keep on Truckin LLC** ("Merchant") and Wide Merchant Investment INC . (the "Company"). and the Company shall jointly be referred to as the parties in this Agreement.

---

Business Legal Name: **Gonna Keep on Truckin LLC**

DBA: **Gonna Keep on Truckin**

Business Address: **12200 Folklore Ct, El Paso, TX 79936**

Business Phone #: **(915) 929-8309**    Fax #:(___) ___-____    Email: **callier74@gmail.com**

Name of Owner or Principal: **Brandon Callier**    Federal Tax ID: **81-2555653**

---

## RECITALS

WHEREAS, Merchant wishes to sell and the Company wishes to purchase the agreed amount of the Merchant's future receivables at the agreed price under the terms and conditions as set forth in this Agreement;

NOW, THEREFORE, in consideration of the rights and obligations contained herein, the Parties agree as follows:

I. PARTIES
  a. The Parties agree that any postal address, email address, telephone number, or fax number listed by a Party in Article I of this Agreement is an acceptable method of contacting that Party for the purposes of giving notice or sending a request under this Agreement.
  b. Address : Wide Merchant Investment, Inc : 3580 Wilshire Blvd. # 160, Los Angeles. CA 90010
    Phone : (800) 630-4214

II. GENERAL TERMS OF SALE

  a. Sale of Future Receivables. Effective upon transfer by the Company to the Merchant of the purchase price specified below ("Purchase Price"), the Merchant sells to the Company all of Merchant's right, title, and interest in the applicable future receivables ("Future Receivables") of the Merchant in the amount specified below ("Specified Amount").
    Merchant and the Company agree that the Purchase Price paid by the Company is in exchange for the Specified Amount of Future Receivables and is not intended to be, nor shall it be construed as, a loan from the Company to Merchant.

| Purchase Price: | **$40,000.00** | Specified Amount: | **$58,400.00** |
|---|---|---|---|

**b. Collection of Future Receivables.** Merchant shall collect the Future Receivables as agent of the Company, and hold those funds in trust for the Company in the bank account designated by the Parties in Exhibit A to this Agreement (the "Designated Account"). All Future Receivables are the absolute property of the Company. The Company has the absolute right, without notice to Merchant, to demand transfer and collect any Future Receivables from any debtor.
**c. Transfer of Future Receivables from Merchant to Company.**

**1. Automatic Clearing House.** The Company shall have the right to collect on a daily basis the Future Receivables and any other owed or collectable amounts under this Agreement from the Designated Account using Automatic Clearing House ("Ach") transfers.

**2. Daily Payment in lieu of Specified Percentage.** The Company may choose, in its sole discretion, to collect the fixed amount specified below ("Daily Transfer"), which the Parties agree is a good faith approximation of daily Future Receivables, from the Designated Account instead of the exact amount of Future Receivables.
Any decision by the Company to collect the Daily Transfer instead of the exact Future Receivables on a given day is for the convenience of the Parties only, and the Company is under no obligation to do so. By collecting the Daily Transfer, the Company does not waive its right to collect the entirety of its Future Receivables due each day.

**Weekly Transfer :** **$1,946.67**

I have read and agree to the terms and conditions set forth above.    Merchant's Initial _____    Merchant's Initial _____

Rev. 070517

**A. Month-End Reconciliation.** If the Company chooses to collect the Daily Transfer in a given month, either Party is entitled, upon its proper request to the other Party, to a reconciliation at the end of that month to ensure that the Company did not collect amounts totaling more or less than the Future Receivables.

**B. Reconciliation Procedures.** To request a month-end reconciliation, the requesting party must furnish its request to the other party within five (5) business days following the end of a calendar month. Within three (3) business days following either Party's receipt of a month-end reconciliation request, the Company must provide the Merchant with sufficient records to show its collection of Future Receivables for that month, and the Merchant must provide the Company with sufficient records to show its cumulative sales for that month. Within three (3) business days after each party has received the required documents from the other, (i) if the Company has not collected the full Future Receivables for that month, then the Merchant must remit to the Company any remaining Future Receivables; (ii) if the Company's collections for that month exceed the Future Receivables for that month, then the Company must return to the Merchant any amounts collected in excess of the Future Receivables.

**C. Inaction.** If neither party properly requests a reconciliation at the end of a given month, then the Company will be deemed to have rightfully collected the entirety of Future Receivables for that month.

**D. No Limitation of Remedies in Event of Fraud.** Nothing within this section II.d.2. shall limit a Party's ability to hold the other in default or seek any remedy available under the law in the event that one Party materially misleads the other by giving false information or withholding relevant information regarding either the Company's collection of Future Receivables or Merchant's cumulative sales in a given month.

**e. Company's Right to Resell.** The Company may at any time, without permission from Merchant, resell any portion of its interest in the Future Receivables or assign its rights in this Agreement to any third party.

**f. No Right to Repurchase.** Merchant acknowledges that it has no right to repurchase the Future Receivables from the Company.

**g. Merchant Records.** Merchant shall indicate the Future Receivables in its records, books, and accounts and mark them appropriately to show they have been sold to the Company.

**h. Notice to Debtors.** The Company may at any time, and without notice to Merchant, notify any debtors of the Future Receivables of their sale to the Company. j. UCC-1 Financing Statement. To secure Merchant's performance under this Agreement, Merchant grants to Company a continuing priority security interest, subject only to the security interest of the Processor, in each of the following property of the Merchant: (a) All accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory wherever located, now or hereafter owned or acquired by the Merchant, (b) All trademarks, trade names, service marks, logos and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively "Trademarks") whether now owned or hereafter acquired, together with any written agreement granting any right to use any Trademarks; and (c) All proceeds, as that term is defined in Article 9 of the Uniform Commercial Code. Merchant understands that the Company will have the right to file one or more UCC-1 Financing Statements prior to or at any time after each sale of Future Receivables in order to perfect the interest created under the UCC upon the sale. The UCC-1 Financing Statements will state that the sale of the Future Receivables is intended to be a sale and not an assignment for security.

**k. Origination Fees.** The Company will charge to Merchant's account the Company's standard origination fee on all wire transfers and/or checks sent via FedEx, in the amount of $300-1950 based on the advance amount, charges for returned items in the amount of $35 per occurrence, and all other bank charges in accordance with Appendix I.The origination fee will be deducted from the Purchase Price at the time of funding, along with any other balances the Merchant owes the Company, which the Company will transfer to the Merchant via a wire transfer and/or check. Merchant agrees to bear the cost of all filing fees, filing taxes, search reports, legal fees and other charges incurred by the Company in the perfection, protection, preservation and enforcement of Company's rights in any collateral in which Merchant has granted the security interest to the Company. Merchant also agrees to promptly pay all fees, costs and expenses (including, without limitation, attorney's fees and allocated costs of internal counsel) incurred by the Company in connection with the creation, or administration of this Agreement or any related instructions, documents or agreements, all costs, fees including the negotiation and documentation of any waivers, forbearances, amendments or other modifications relating to this Agreement or any such related agreements, and all fees, costs and expenses will be part of the obligations, will be payable on demand and will be secured by any collateral in which Merchant has granted to the Company. The Company may also, at its option, charge the Designated Account for all amounts owing by Merchant to the Company under this Agreement and for all other obligations. The actual amount charged under this section may change from time to time, and the table of related charges assessed by the Company at a given time will be available on the Company's web page or may be requested in writing.

**l. Definition of Future Receivables.** As used in this Agreement, the "Future Receivables" are those future receivables owned by the Company, and are the percentage specified below ("Specified Percentage") of the Merchant's sales for each day after the Effective Date, up to the Specified Amount. The Company owns all right, title, and interest in the Future Receivables.

**Specified Percentage:**      **6%**

# III. REQUIRED INFORMATION

**a. Credit Information.** Merchant, each signor to this Agreement on Merchant's behalf, and each Guarantor listed in Exhibit C to this Agreement authorizes the Company and its agents and representatives and any credit reporting agency employed by the Company to investigate any references given or any other statements of data obtained from or about Merchant or any of its principals for the purpose of this Agreement and to pull credit reports at any time now or in the future on the Merchant and Owner/Guarantor(s).

**b. Banking Information.** Merchant shall provide its business banking information as requested by the Company. Merchant represents and acknowledges that it utilizes the Designated Account as its only account for the purpose of running its business, and all receivables from Merchant's sales are deposited into that account. If other banks or more than one account is utilized by the Merchant for these purposes, the additional bank information shall be provided to the Company.

I have read and agree to the terms and conditions set forth above.          Merchant's Initial _____     Merchant's Initial _____

## IV. GUARANTY

The Merchant, including but not limited to its owners, shareholders, partners, directors or officers, hereby guarantees Merchant's performance of all the covenants made by Merchant in this Agreement, including the following covenants: (i) To conduct its business consistent with past practice; (ii) To exclusively use Processor for the processing of all of its credit card transactions, if applicable; (iii) Not to take any action to discourage the use of credit cards or to permit any event to occur which could have an adverse effect on the use, acceptance or authorization of credit cards for the purpose of Merchant's services and products;(iv) Not to change its arrangements with Processor in any way which is adverse to the Company; (v) Not to take any action that has the effect of causing the credit card processor through which the major credit cards are settled to be changed from Processor to another credit card processor; and (vi) Not to sell, dispose, convey or otherwise transfer its business or assets without the express prior written consent of the Company and the assumption of all of Merchant's obligations under this Agreement pursuant to documentation reasonably satisfactory to the Company.

## V.  ADDITIONAL REPRESENTATIONS, WARRANTIES, AND COVENANTS

**a. Information Regarding Business.** Merchant warrants that the information (financial and other) provided by or on behalf of Merchant to the Company in connection with the execution of or pursuant to this Agreement is true and correct in all material respects. Merchant shall furnish the Company with any additional information, documents or instruments which the Company may request from time to time.  Merchant's representation and warranty also includes that Merchant will be in business for the foreseeable future, Merchant is and has been profitable, there is no claim pending or expected against Merchant, and Merchant's financial situation is not expected to change in the foreseeable future.

**b. Reliance on Information.** Merchant acknowledges that the information (financial and other) provided by Merchant has been relied upon by the Company in connection with its decision to purchase the Future Receivables.

**c. Governmental Approvals.** Merchant possesses and is in compliance with all permits, licenses, approvals, consents and other authorizations necessary to conduct its business. Merchant is in compliance with any and all applicable federal, state and local laws and regulations. Merchant possesses all requisite permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**d. Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to enter into and perform the obligations under this Agreement and the Processing Agreement. This Agreement and the Processing Agreement have been duly authorized by all necessary and proper action, has been executed by and on behalf of Merchant and constitutes a valid and binding obligation of Merchant.

**e. Insurance.** Merchant will maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the reasonable request of the Company.

**f. Change of Name or Location.** Merchant will not conduct Merchant's business under any name other than as disclosed to Processor or the Company or change any of its places of business.

**g. Merchant Not Indebted to Company.** Merchant warrants that it is not a debtor of the Company as of the date of this Agreement.

**h. Exclusive Use of Processor.**  Merchant understands that the services of the credit card processor listed by Exhibit B to this Agreement (the "Processor") is the exclusive means by which the Merchant can process its credit card transactions.

**i. Continuation of Business.**  The Merchant agrees to make all reasonable efforts to stay in business and generate receivables until it has remitted the entire Specified Amount to the Company.

## VI. CONSTRUCTION AND ENFORCEMENT

**a. No Waiver.**  Failure or delay by any Party to enforce any provision of this Agreement shall not be construed to be a waiver of such provisions or their rights thereafter to enforce such provisions or any other provision, nor shall any single or partial exercise by any Party to enforce any provision of this Agreement.

**b. Complete Agreement.**  The Parties agree that this instrument is a complete and total expression of the Parties' agreement. All past and contemporaneous representations and promises by and between the Parties have been integrated into this Agreement, or they are hereby waived and disclaimed. In no event shall the terms of this Agreement be supplemented or modified from their defined or plain meaning by extrinsic or parol evidence.

**c. Modification and Severance.**  This Agreement may not be amended, modified or supplemented in any respect except by a subsequent written agreement entered into by the Parties referencing this Agreement and signed by both Parties. If any part of this Agreement is found invalid or unenforceable, such part shall be deemed stricken herefrom and the remainder of the Agreement shall remain at all times in full force and effect.

**d. Counterparts.**  This Agreement may be executed in counterparts, which taken together shall be deemed one instrument. All executed copies of this Agreement are duplicate originals, equally admissible as evidence.

**e. Survival of Representations.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force and effect until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

I have read and agree to the terms and conditions set forth above.     Merchant's Initial _____     Merchant's Initial _____

**f. Voluntary Action.** The Parties hereto acknowledge and agree that they have entered into this Agreement of their own free will and volition and were not coerced to do so, nor under duress at the time of executing this agreement.

**g. Construction.** All Parties have contributed to the negotiation and drafting of this Agreement and any latent or patent ambiguity in this Agreement shall not be construed against any one Party as drafter of the same.

**h. Grammar.** As used in this Agreement, the singular or plural number shall be deemed to include the other whenever the context so indicates or requires.

**i. Captions.** Captions contained in this Agreement are inse1ied only as a matter of convenience and shall not, in any way, define, limit, or extend or otherwise affect the scope or intent of this Agreement or any provision hereof.

**j. Incorporation of Recitals.** The recitals above are integral hereto and are incorporated herein by reference.

**k. Definition of "Day" and "Daily".** The terms "day" and "daily" shall refer to and mean a weekday that the Merchant is transacting its normal business including any national or local holiday. Unless ACH or credit card processor allows the delivery of the receivables created on holidays, the receivables created on a holiday shall be delivered to the Company a business day before the holiday.

**l. Governing Law and Application.** The validity, interpretation, construction, performance, enforcement, and remedies of or relating to this Agreement, and the rights and obligations of the Parties to this Agreement, shall be governed and construed in all respects by the substantive laws of the State of Texas (without regard to the conflict of laws rules or statutes of Texas or any other jurisdiction that might result in the application of other law). All disputes arising under or related to this Agreement shall be commenced and maintained exclusively in the federal and state courts situated in the County of Harris, State of Texas, and all Parties hereby irrevocably submit to the jurisdiction and venue of any such court.

**m. Jury Trial Waiver.** The Parties hereto waive trial by jury in any court in any suit, which this Agreement is a part or the enforcement hereof, except where such waiver is prohibited by law or deemed by a court of law to be against public policy. The parties hereto acknowledge that each makes this waiver knowingly, willingly, and voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

## VII. DEFAULT

**a. Events of Default.** Events and occurrences that constitute an "Event of Default" on the part of Merchant include, but are not limited to: (a) Merchant fails to meet or perform its material obligations under this Agreement; (b) Merchant fails to maintain a balance in the Designated Account according to section II.d.4. of this Agreement; (c) Merchant fails to collect the Future Receivables as agent of the Company and hold those funds in trust for the Company in the Designated Account; (d) Merchant intentionally, knowingly, or negligently withholds any material document or information it is required to produce to the Company under this Agreement; (e) Merchant intentionally, knowingly, or negligently produces to the Company any document or information that is false in any material respect when produced; (f) Merchant fails to make any remittance required by this Agreement; (g) Merchant commits any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future supplement or amendment hereto or of any other agreement between the Company and Merchant; (h) Merchant becomes insolvent or unable to meet Merchant's debts as they mature; (i) Merchant fails to pay when due any material obligations or liabilities owing by Merchant to any person or entity (including without limitation, any United States and state taxes); (j) Merchant calls, or has called by a third party, a meeting of creditors; (k) any bankruptcy proceeding, insolvency arrangement or similar proceeding is commenced by or against Merchant; (l) Merchant suspends or discontinues doing business for any reason; (m) a receiver or trustee of any kind is appointed for Merchant or any of Merchant's property; (n) any guarantor of Merchant's Obligations dies or becomes insolvent or has commenced by or against such guarantor any bankruptcy proceeding, insolvency arrangement or similar proceeding; (o) any guaranty of Merchant's Obligations is terminated; (p) any change of ownership occurs with respect to more than forty (40%) percent of Merchant's capital stock, assets or ownership interest; (q) a notice of lien, money judgment, levy, assessment, seizure or writ or warrant of attachment is entered or filed against Merchant or with respect to the Accounts or any other collateral in which Merchant has granted Company a security interest; (r) Merchant sells, leases, transfers or otherwise disposes of all or substantially all of Merchant's property or assets, or consolidates with or merges into or with any corporation or entity; (s) Merchant sells, transfers, assigns any part of the Merchant's daily receivables.

**b. Termination after Default.** Upon the occurrence and during the continuance of an Event of Default, the Company shall have the right to terminate this Agreement and all other arrangements existing between the Company and Merchant forthwith and without notice.

**c. Company's Right to Recover.** In the event that the Company terminates this Agreement pursuant to section VII.b. of this Agreement, the Company shall have the following rights to recover the value of its interest in any remaining Future Receivables along with any fees or amounts owed to the Company by the Merchant under this agreement:

**1. Right to Immediately Recover Remaining Value of Future Receivables.** In the event of termination, the difference in value between Future Receivables that have been collected by the Company and the Specified Amount, along with any other fees or amounts owed to the Company under this Agreement, shall become immediately due and deliverable to the Company by Merchant and its Guarantors. Merchant agrees that the Company may automatically debit such amounts from the Designated Account via an automated clearing house system or wire transfer.

**2. Right to Exercise Security Interests.** The Company shall have all rights of a secured party under the Uniform Commercial Code, including, without limitation, the right to take possession of any collateral in which the Company has a security interest and to dispose of same at public or private sale, with Merchant and its Guarantors liable for any deficiency. Company will not be required to proceed against any collateral but may proceed against Merchant and its Guarantors directly.

**3. Right to Use Credit Card Processor.** The Company shall have the right to collect the difference in value between Future Receivables that have been collected by the Company and the Specified Amount, along with any other fees or amounts owed to the Company under this Agreement, by using a credit card processor.

I have read and agree to the terms and conditions set forth above.        Merchant's Initial _____        Merchant's Initial _____

**A. Credit Card Processing Agreement.**  To allow the Company to exercise its right to use a credit card processor, the Merchant specifically agrees to enter into a credit card processing agreement reasonably acceptable to the Company to obtain credit and processing services. Merchant must authorize the Processor to pay the credit card receivables collected in the sum attributable to any amount owed under section VII.c. of this Agreement rather than to Merchant.  Merchant shall not change its processor or enter into processing agreements with other processors without Company's prior written consent.

**B. Special Power of Attorney.**  To ensure the Company has sufficient ability to collect amounts due under section VII.c of this Agreement by using a credit card processor, Merchant gives a special power of attorney authorizing the Company to communicate with Merchant's credit card processor for the purpose of demanding the delivery of Merchant's future receivables, statements, account information, balance, daily activities.  This special power of attorney may not be revoked by the Merchant until the full value of Future Receivables and other fees and amounts owed under this Agreement have been delivered to the Company.

**d. Rescission of Agreement.** Merchant agrees that in the event that its representations and warranties included in this Agreement are not true and correct, the Company shall be entitled to rescind this Agreement and to the return of the Purchase Price from the Merchant less any Future Receivables that have been received by the Company. Merchant agrees that the Company may automatically debit such rescission amount from the Designated Account via the automated clearing house system, wire transfer, or credit card processor.

**e. Other Remedies.**  In the event that any of Merchant's representations and warranties contained in this Agreement are not true and correct, or in the event of Merchant's breach of any of the covenants contained in this Agreement, the Company shall be entitled to all remedies available under law or in equity, including but not limited to, the right to non-judicial foreclosure. Merchant shall pay the Company's reasonable costs associated with the Event of Default and the enforcement of the Company's remedies set forth above, including but not limited to collection costs, court costs and attorney's fees.

## VIII. COMMUNICATION

**a. Telephone and Electronic Communications.**  The Merchant authorizes the Company to use any form of telephonic and electronic method of communication to make calls and to send pre-recorded messages, text messages, multimedia messages, e-mails, faxes, and voicemails. The Merchant understands and agrees that the Company may use any provided telephonic and electronic method of contact to send invoices, account information, collection purposes and marketing material.

## IX. TERM AND TERMINATION

**a. Term of Agreement.**  This Agreement will be in full force and effect until the Specified Amount of Future Receivables has been delivered by Merchant to the Company along with all other fees and amounts owed by Merchant to the Company under this Agreement.

**b. Early Termination.**  Notwithstanding section VIII.a. of this Agreement, the Company may terminate this agreement early by giving Merchant not less than sixty (60) days prior written notice thereof.

## <u>MERCHANT</u>

*I represent that I am authorized to sign this Agreement for Merchant and that the information provided in this Agreement and all of the Company's forms are true and accurate in all respects. If the information is false or inaccurate, the Merchant shall be deemed to be in material breach of all agreements between the Merchant and the Company, and the Company shall be entitled to all remedies available under law.*

**IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above as the "Effective Date".**

| "Merchant" | "Merchant" |
|---|---|
| ➜ _____ | ➜ _____ |
| By :  Brandon Callier | By : |

| "Company" |
|---|
| _____ |
| By : |
| Wide Merchant Investment, Inc. |

I have read and agree to the terms and conditions set forth above.

Merchant's Initial _____     Merchant's Initial _____

Rev. 070517



**Wide Merchant Group**

**TEL 800.630.4214 FAX 866.221.4316**

## Authorization For ACH Electronic Funds Transfer Payments

I hereby authorize Wide Merchant Investment, to initiate debit/credit entries to the business bank account specified below ("Designated Account") for all transfers due to Wide Merchant Investment, including any returned unpaid item fees due and the Financial Institution at which the account is held to debit/credit the same to such account. This authority is to remain in full force and effect until Wide Merchant Investment, and the subject Financial Institution have received written notification from the business of its termination in such time and in such manner as to afford Wide Merchant Investment, and the Financial Institution a reasonable opportunity to act on it. I understand this authorization may be cancelled by providing written notice to Wide Merchant Investment, at least three (3) business days prior to the transfer due date. I further understand that canceling this authorization does not relieve the business of the responsibility of paying all amounts due in full.

Bank Name: _____ Chase _____

Account Number: _____ 151255566 _____

Routing Number: _____ 111000614 _____

Account Name: _____ Gonna Keep on Truckin LLC _____

Principal Owner: **Brandon Callier** _____

Title: _____

Best Contact Number: _____

Signature: ➜ _____

Secondary Owner: _____

Title: _____

Best Contact Number: _____

Signature: ➜ _____

I have read and agree to the terms and conditions set forth above.          Merchant's Initial _____     Merchant's Initial _____

Rev. 070517

# EXHIBIT C PERSONAL
# GUARANTY

1. The undersigned (individually, and collectively if more than one, referred to herein as "Guarantor"), whose address and Social Security/tax identification are set forth below, as a material inducement to and in consideration of Wide Merchant Investment INC entering into the Purchase and Sale of Future Receivables Agreement ("Agreement") dated _____03/17/2022_____ with _____Gonna Keep on Truckin LLC/Brandon Callier_____, hereby unconditionally, irrevocably and jointly and severally guarantees the full and punctual payment, performance and observance of each and all of the terms, covenants and obligations of Merchant and each successor and assign of Merchant, of whatever kind and nature, under or in connection with the Agreement or any agreement, instrument or document executed by Merchant in connection with the Agreement as such the Agreement or other agreement, instrument or document may hereafter be amended or modified, whether or not Guarantor has notice or knowledge of or consents to such amendment or modification, including but not limited to the payment and all other sums now or hereafter becoming due or payable under the Agreement, without any deduction whatsoever, whether by reason of offset, counterclaim or otherwise.

2. The liability of Guarantor under this Guaranty is primary and a separate action may be brought and prosecuted against any Guarantor whether or not an action is brought or prosecuted or a judgment obtained against any other Guarantor or Merchant. Guarantor further agrees that it may be joined in any action against and in connection with the obligations of Merchant under the Agreement and that recovery may be had against Guarantor in any such action. If Merchant defaults under the Agreement, the Company may proceed immediately against Guarantor or Merchant, or Guarantor pursuant to this Guaranty. Company may enforce this Guaranty against Guarantor without giving previous notice to Merchant or Guarantor, and without making any demand on either of them. This Guaranty shall not be affected by Company's failure or delay to enforce any of its rights hereunder or under the Agreement. Guarantor hereby waives notice of or the giving of its content to any amendments which may hereafter be made to the terms of the Agreement, and this Guaranty shall guarantee the performance of the Agreement as amended, or as the same may be assigned from time to time.

3. Guarantor waives the right to require Company (i) to proceed against Merchant or any other Guarantor or any other person or entity liable to Company or to proceed under any other remedy Company has before proceeding against Guarantor; (ii) to pursue any other remedy in Company's power. Guarantor waives all right to assert or plead any statute of limitations as to or relating to this Guaranty or the Agreement. Guarantor waives any defense based upon or existing by reason of any disability of Merchant, and any other defense based upon or arising out of the termination, invalidity or unenforceability of the Agreement or Merchant's liability or Company's receipt or release of any security. Until all of the Merchant's obligations to Company have been discharged in full, Guarantor shall have no right of subrogation against Merchant. Guarantor waives its right to enforce any remedies that Company now has, or later may have, against Merchant. Guarantor waives any right to participate in any security now or hereafter held by Company. Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notices of protests, notices of dishonor, and notices of acceptance of this Guaranty, and waives all notices of existence, creation or incurring of new or additional obligations from Merchant to Company.

4. No assignment under said Agreement shall relieve Guarantor of any obligations under this Guaranty whether or not Guarantor has notice of or consents to any such assignment. This Guaranty shall be continuing and shall remain in full force and effect so long as any obligations which are subject to this Guaranty continue to exist

5. If Company is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Company all costs incurred, including, without limitation, Company's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection or any negotiations relative to the obligations hereby guaranteed, or in enforcing this Guaranty against the undersigned, individually or jointly.

6. This Guaranty shall continue unchanged by any bankruptcy, reorganization or insolvency of the Merchant or any successor or assignee thereof or by any disaffirmation or abandonment by a trustee of Merchant.

## GUARANTOR/ CO-GUARANTOR

| | | | |
|---|---|---|---|
| **By:** | 03/17/2022 | **Print Name:** | **Brandon Callier**   SSN :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 |
| (Signature) **Brandon Callier** | (Dated) | | |
| **By:** | 03/17/2022 | **Print Name:** | SSN :___-__-____ |
| (Signature) | (Dated) | | |

**Address:**   **6336 Franklin Trail Dr, El Paso, TX  79912**

**Telephone:**   **(915) 383-4604**

**Witness:** _____   **Print Name:** _____
(Signature)          (Dated)

I have read and agree to the terms and conditions set forth above.          Merchant's Initial _____   Merchant's Initial _____



**Wide Merchant Group**

**TEL 800.630.4214  FAX 866.221.4316**

## APPENDIX: FEE STRUCTURE (effective as of Jan 1st, 2020)

I. Origination Fee – $300-1,950 to cover underwriting and related expenses. The respective origination fee will be deducted from your Purchase Price at the time of funding.
  a. $300 – advances from $0 to $4,999
  b. $500 – advances from $5,000 to $9,999
  c. $900 – advances from $10,000 to $19,999
  d. $1,000 – advances from $20,000 to $29,999
  e. $1,400 – advances from $30,000 to $49,999
  f. $1,950 – advances from $50,000 and above

II.  NSF Fee (Standard) - $35.00 each. An account that exhibits a consecutive amount of 5 NSF fees are to be considered Default Account

III. Transfer Adjustment fee - $500.00 each time. For each instance where an adjustment to the regular ACH is requested, there will be a Transfer Adjustment fee applied to the balance

IV. Stop Payment Fee - $800.00 each time. For each instance where there is a Stop Payment, there will be a Stop Payment Fee added to your outstanding balance.

V. UCC Termination Fee - $300.00 each time. Any request to terminate a UCC Filing will result in a UCC Termination Fee.

VI. Weekly Transfer Modification Fee - $500 once. For merchants with a Weekly Transfer only. If the Weekly ACH bounces/returns, a fee of $500
will be applied to your remaining balance.

VII. ACH Deferment Fee - $105.00 each time. An ACH Deferment Fee will be applied for each instance where an interruption of the agreed
repayment plan has been caused by an account closure, frozen account and/or instances 2 or more consecutive return ACHs.

I have read and agree to the terms and conditions set forth above.        Merchant's Initial _____        Merchant's Initial _____

Rev. 070517

## Certificate Of Completion

Envelope Id: F42855AC4C80476EB1A37CA7FF32D652
Subject: Please DocuSign Contract: Gonna Keep on Truckin
Source Envelope:
Document Pages: 8
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 0
Initials: 0

Status: Delivered

Envelope Originator:
Wide Merchant Group
3580 wilshire blvd Ste 160
Los Angeles, CA 90010
info@widemerchantgroup.com
IP Address: 76.79.248.134

## Record Tracking

Status: Original
    3/17/2022 4:22:43 PM

Holder: Wide Merchant Group
    info@widemerchantgroup.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
| --- | --- | --- |
| Brandon Callier<br>callier74@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | | Sent: 3/17/2022 4:24:31 PM<br>Resent: 3/21/2022 8:00:56 AM<br>Resent: 3/23/2022 11:20:45 AM<br>Viewed: 3/23/2022 11:35:34 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 3/18/2022 11:24:20 AM<br>    ID: bc1c3536-4364-411e-96e8-e06a83f94635 | | |

| In Person Signer Events | Signature | Timestamp |
| --- | --- | --- |

| Editor Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Agent Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Intermediary Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Certified Delivery Events | Status | Timestamp |
| --- | --- | --- |

| Carbon Copy Events | Status | Timestamp |
| --- | --- | --- |
| Andy Abascal<br>andy@widemerchantgroup.com<br>Wide Merchant Investment<br>Security Level: Email, Account Authentication<br>(None) | COPIED | Sent: 3/17/2022 4:24:30 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| David Kim<br>david@widemerchantgroup.com<br>CEO<br>Security Level: Email, Account Authentication<br>(None) | COPIED | Sent: 3/17/2022 4:24:30 PM<br>Viewed: 3/17/2022 5:11:14 PM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| info<br>info@widemerchantgroup.com<br>Wide Merchant Group<br>Security Level: Email, Account Authentication<br>(None) | COPIED | Sent: 3/17/2022 4:24:30 PM |
| **Electronic Record and Signature Disclosure:** | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Not Offered via DocuSign | | |
| Melissa Duffus<br>melissa@widemerchantgroup.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/17/2022 4:24:30 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Oke Okito<br>oke@widemerchantgroup.com<br>Account Executive<br>Okito<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/17/2022 4:24:31 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Sol Min<br>Sol@widemerchantgroup.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/17/2022 4:24:31 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/17/2022 4:24:31 PM |
| Certified Delivered | Security Checked | 3/23/2022 11:35:34 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wide Merchant Group (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wide Merchant Group:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: andy@widemerchantgroup.com

**To advise Wide Merchant Group of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at andy@widemerchantgroup.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Wide Merchant Group**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to andy@widemerchantgroup.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Wide Merchant Group**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to andy@widemerchantgroup.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Wide Merchant Group as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Wide Merchant Group during the course of your relationship with Wide Merchant Group.